Ronald E. Coleman, J.
On August 25, 1958 the State of New York appropriated a certain portion of claimants’ property consisting of 22.692± acres situate in the Town of Lewiston, County of Niagara, pursuant to section 30 of the Highway Law and acts amendatory thereto as made applicable by section 1007 of the Public Authorities Law, by filing Map No. 640, Parcel No. 640, Niagara Power Project, and a description of the said property in the office of the County Clerk of Niagara County. The court adopts the description of the appropriated property shown and set forth on the map filed in the County Clerk’s office and reference is hereby made thereto for such description without further repetition thereof. The claim was duly filed on December 15, 1968 and has not been assigned or submitted to any other court or tribunal for audit or determination. The court has viewed the premises.
Claimants owned the property by reason of a deed dated February 4, 1957 from Emplor Corporation to them, recorded in the Niagara County Clerk’s office in Liber 1257 of Deeds at page 389. Prior to the appropriation the property consisted of 53.49 acres and was located on the northerly and southerly sides of Upper Mountain Road approximately one mile easterly from the intersection of that road and Military Road, being bounded on the south by Moyer Road.
Prior to the appropriation, no lands were available in the City of Niagara Falls for any large-scale residential development, *855 and the Town of Lewiston particularly the area in which claimants’ land was located, had been developing as a residential suburb for the city. As evidenced by the development of residential subdivisions in the vicinity of claimants’ property, the best available use of their property was for residential purposes, and was zoned so that it could be used for that purpose. While not denying that the best available use was for residential purposes, the State contended that its best use was for a “ potential real estate subdivision to be developed at such time as water and sewer facilities were available and as the demand for subdivision lots warranted.” The availability of water and sewer facilities as well as the demand were facts which would be taken into consideration by a prospective buyer in determining the price that he would be willing to pay for claimants’ property prior to the appropriation and have been considered likewise by us in arriving at the award made herein.
Prior to the appropriation, a willing buyer reasonably could have determined that there would be a demand for housing in the Niagara Falls area and that the logical place for the development of such new residential subdivisions in the near future was on Upper Mountain Road.
Claimants retained the Emplor Corporation to have plans-made to develop their property as a subdivision. Emplor employed an engineer and a land surveyor to survey the property and to lay out a subdivision. As a result, a subdivision map and a topographical map were filed with the Planning Board of the Town of Lewiston on January 21, 1958. The said maps provided for 114 lots and it was not disputed that the property was best suited for a 114-lot development. Aside from some informal discussion with the Planning Board by representatives of the claimants, no action was taken on the proposed establishment of a subdivision for the reason that the State commenced work on the Niagara Power Project.
No public water or sewer facilities were located on claimants’ property. It was the State’s contention that no water could be made available to this property at least in the near future and that the soil conditions were such that septic tanks could not be utilized for sewage. Water from the City of Niagara Falls had been extended by a main on Upper Mountain Road to a point easterly 1,500 feet from its intersection with Military Road. City water also was available to this property by obtaining access to James Drive to the north and the Escarpment Water District. There had been difficulties with water pressure in the Escarpment Water District and a question was raised as to whether or not the district could be enlarged to take in addi *856 tional subdivisions. Prior to the appropriation various water authorities as well as town officials had been engaged in making studies of means by which an adequate water supply could be made available to this area. The entry of the Power Authority in the area brought an end to these discussions. On all the evidence, we find that it would have been possible in the near future to have obtained an adequate water supply for the proposed subdivision on claimants’ property. A willing buyer would have considered the probable cost of making water available to this property without other landowners participating in the cost of doing so.
There were a number of established subdivisions in this area making use of individual septic tanks for sewage disposal. While some persons living in these other subdivisions had difficulty with septic tanks, the record does not establish that these difficulties were any other than the usual ones in connection with the use of septic tanks. This is further evident by the fact that these subdivisions continued to develop during this same period. On all the evidence we find that the soil conditions in the established subdivisions were the same as those found on the claimants’ property and that individual septic tanks could have been utilized in a like development on the claimants’ land.
The State made proof that there was available in this area a considerable number of acres for subdivision purposes and that if all were developed at once there would not be an adequate market. This is not unusual in new areas about to be developed for subdivisions and is a fact which a willing buyer would have taken into consideration together with the adaptability of a given property for early development. On all the information available at the time of the appropriation, a willing buyer reasonably could have determined that there was and would be an unusual demand for housing in this particular area. The State further contended that subsequent events established that there was no such demand. On all the credible evidence, we cannot say that a prudent buyer should have foreseen subsequent events and the reasons for the same which to date apparently have brought about a contrary result.
Claimants made proof concerning the sales of lots in nearby subdivisions for years prior to and after the appropriation and development costs. The State’s proof was on an acreage basis. In view of the fact that these subdivisions were recently developed and were located in the vicinity of the claimants ’ land, we consider these sales of probative value. We have not drawn a tight line between raw acreage and subdivision value. (Hazard Lewis Farms v. State of New York, 1 A D 2d 923.) The sales *857 of these individual lots indicated reasonable certainty that claimants’ land could have and would have been developed in the near future and that such land was readily marketable for subdivision purposes at the time of the appropriation. (Valley Stream Lawns v. State of New York, 9 A D 2d 149.) The mere fact that owners of similar acreage property in this area were not offering it for sale prior to the appropriation and apparently were holding the same in anticipation of a rising market or even for some other reason, does not change the availability of claimants’ property for a subdivision development.
By Map No. 640, Parcel No. 640, the State appropriated 22.692± acres of claimants’ property on which it constructed a dam, a reservoir and a high tension line. There remained after the appropriation approximately 6.5± acres on the southerly side of Upper Mountain Road with a frontage thereon of approximately 600 feet and an average depth of 300 feet. At best, this 6.5 acres could be used for single houses facing on the road. As a result the claimants’ remaining land southerly of Upper Mountain Road has suffered consequential damages. In addition, after the appropriation claimants still had approximately 24± acres on the northerly side of Upper Mountain Road which remained available and could have been used for a housing development. Claimants’ remaining land northerly of Upper Mountain Road has sustained no consequential damages as a result of the appropriation.
While various and conflicting sales and methods of computing values were submitted on the trial, the methods used were mainly the raw acreage and the subdivision methods. In arriving at our award herein, we have not adopted exclusively either method, but have considered all the factors affecting the property which would have been considered by a reasonable seller and a reasonable purchaser in arriving at a purchase price. (Sparkill Realty Corp. v. State of New York, 254 App. Div. 78, affd. 279 N. Y. 656.)
At the time of the appropriation herein the fair and reasonable market value of the claimants’ property was $129,000 and immediately after the appropriation was $70,000. By reason of the appropriation herein claimants are awarded the sum of $59,000 for land taken and consequential damages to the remainder with interest thereon from August 25, 1958 to date of entry of judgment herein.